**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| DONNA JEAN SEXTON-PEMBERTON, | ) | |
| as Administratrix and personal | ) | |
| representative of the ESTATE of | ) | |
| BENNY SHANE PEMBERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. _____ |
| | ) | |
| SCOTT COUNTY, Tennessee, | ) | Jury of Twelve Demanded |
| a governmental entity; | ) | |
| RONNIE PHILLIPS, individually; | ) | |
| TOMMY SILCOX, individually; | ) | |
| RANDY LEWALLEN, individually; | ) | |
| BRITTNEY BROWN, individually; | ) | |
| DEREK PHILLIPS, individually; | ) | |
| LEE JOHNSON, individually; | ) | |
| AMY NICELY, individually; | ) | |
| TANNER BOSHEARS, individually; | ) | |
| SHANE MASON, individually; | ) | |
| JOHN and JANE DOES 1-10, | ) | |
| employees of the Scott County Sheriff's | ) | |
| Department, individually; | ) | |
| ADVANCED CORRECTIONAL | ) | |
| HEALTHCARE, INC.; | ) | |
| BRITTANY MASSENGALE, LPN, | ) | |
| JOHN and JANE DOES 11-15, | ) | |
| employees of the ADVANCED | ) | |
| CORRECTIONAL HEALTHCARE, INC. | ) | |
| | ) | |
| Defendants. | ) | |

_____

**COMPLAINT FOR DAMAGES**
_____

I.     NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       A.    Mr. Pemberton Is Jailed and Exhibits Symptoms of a Serious Illness . . . . . . . . 14

       B.    Mr. Pemberton Is Infected With MRSA – a Potentially Fatal Bacteria . . . . . . . 15

       C.    Each Hour, Mr. Pemberton's Medical Condition Was Getting Progressively Worse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       D.    "He Was Very Sick.  He Was Very Very Sick" . . . . . . . . . . . . . . . . . . . . . . . . 17

       E.    Corrections Officers Move Mr. Pemberton to "the Hole" . . . . . . . . . . . . . . . . . 17

       F.    Inmates Describe Mr. Pemberton As "Getting Around Like a 90-Year Old Man" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       G.    Mr. Pemberton Received No Form of Medical Treatment at the Scott County Jail for the Infection Spreading Through His Body . . . . . . . . . . . . . . . . . . . . . . 19

       H.    "It Got to Where He Couldn't Do Anything" . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       I.    Mr. Pemberton "Begged for Medical Attention the Whole Time He Was There" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       J.    Even on the Last Three Days of Mr. Pemberton's Life, as the Infection Had Likely Entered His Brain and Multiple Organs, Corrections Officers Failed to Help Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       K.    Mr. Pemberton Is Found Naked and Comatose in His Cell in His Own Urine and Excrement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

L.      Mr. Pemberton is Treated at NKMC and Transferred. . . . . . . . . . . . . . . . . . . . . 23

M.      On Arrival at UTMC, Mr. Pemberton Is Likely Brain-Dead, But Physicians Attempt to Save Him Via Brain Surgery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

N.      Autopsy Reveals That the MRSA Had Entered Mr. Pemberton's Brain, Heart, and Multiple Other Organs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

O.      Misrepresentations and Concealment By Corrections Officers and Failure to Provide Truthful Information to EMS and Hospital Medical Staff About Mr. Pemberton's Two-Week Long Serious Illness. . . . . . . . . . . . . . . . . . . . . . . . . . 27

P.      Scott County's Refusal to Discuss the Case or to Investigate the Circumstances Surrounding Mr. Pemberton's Death. . . . . . . . . . . . . . . . . . . . . 29

Q.      The Circumstances Require Discovery to Permit Plaintiff to More Precisely Allege Her Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.   WAIVER OF IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI.  CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

COUNT ONE – VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF LAW
42 U.S.C. §§ 1983 & 1988 Failure to Provide Adequate Medical Care. . . . . . . . . . . . . . . . . . . . 31

COUNT TWO – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
42 U.S.C. §§ 1983 and 1988 Failure to Train and Supervise/Acquiescing-In and Ratifying Unconstitutional Conduct of Subordinates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

COUNT THREE – VIOLATION OF FEDERAL CIVIL RIGHTS
42 U.S.C. §§ 1983 and 1988 Failure to Protect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

COUNT FOUR – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM)
Failure to Provide Adequate Medical Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

COUNT FIVE – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
42 U.S.C. §§, 1983 and 1988 (MONELL CLAIM)
Failure to Train and Supervise and Ratification of Unconstitutional Conduct. . . . . . . . . . . . . . 43

COUNT SIX – VIOLATION OF FEDERAL CIVIL RIGHTS
42 U.S.C. §§ 1983 and 1988 (MONELL CLAIM)
Use of Cruel and Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

COUNT SEVEN – VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
42 U.S.C. §§, 1983 and 1988. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

COUNT EIGHT – WRONGFUL DEATH
TENN. CODE ANN. §§ 20-5-106 et seq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

COUNT NINE – OUTRAGEOUS CONDUCT/ INTENTIONAL INFLICTION
OF EMOTIONAL DISTRESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

VII.   JURY DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VIII.   PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**COMES** DONNA JEAN SEXTON-PEMBERTON, as Administratrix and personal representative of the ESTATE of BENNY SHANE PEMBERTON ("Plaintiff"), and files her Complaint against the Defendants, SCOTT COUNTY, Tennessee, RONNIE PHILLIPS, individually, TOMMY SILCOX, individually, RANDY LEWALLEN, individually, BRITTNEY BROWN, individually, DEREK PHILLIPS, individually, LEE JOHNSON, individually, AMY NICELY, individually, TANNER BOSHEARS, individually, SHANE MASON, individually, and JOHN and JANE DOES 1-10, employees of the Scott County Sheriff's Department, individually, ADVANCED CORRECTIONAL HEALTHCARE, INC.; and BRITTANY MASSENGALE, LPN, JOHN and JANE DOES 11-15, employees of the ADVANCED CORRECTIONAL HEALTHCARE (collectively, "Defendants").

## I. NATURE OF ACTION

1.      Benny Shane Pemberton ("Mr. Pemberton" or "decedent") was a slightly-built forty-one (41)-year old father when he was arrested and booked in the Scott County Jail under a $200 bond on July 6, 2016 on an out-of-state warrant for failure to pay child support.  Two weeks later, in the early morning hours of July 20, 2016, Mr. Pemberton was lying naked and comatose on the floor of an isolation-cell in his own excrement and urine.  Even externally, his body was in a ravaged and decrepit state, covered by multiple abscesses, contusions, abrasions, deep subcutaneous cuts, and lesions.  His hands and fingers showed signs of gangrene and according one medical report, his body exhibited other signs of a "grossly visible pattern of necrosis."

2.      Internally, it was much worse.  What began as a deep cut on Mr. Pemberton's left foot became infected.  While incarcerated, the infection began to spread to other parts of his body, initially moving up his leg, and ultimately to his brain.  The infection even went to his heart, but an

-1-

autopsy also found septal abscesses in Mr. Pemberton's liver, both kidneys, spleen, and pancreas. Worst of all, Mr. Pemberton's brain – filled with "massive bacterial colonies" – had disintegrated due to the infection. By at least July 15, 2016, five days before his death, Mr. Pemberton began to experience multiple-organ failure, his body began shutting down, his body temperature decreasing to hypothermic levels.

3.     In the two-week interval between being booked and being discovered comatose in an isolation cell, Mr. Pemberton – in unbearable pain caused by the infection spreading through and rapidly disabling his body – had begged, cried, and screamed to corrections officers, nurses, and other inmates for help and medical attention. His pleas for help fell mostly on deaf ears, as Corrections Officers and Jail nurses refused to help him in any way. On multiple occasions, Mr. Pemberton "asked for help" and Corrections Officers responded by "laughing and making fun of him," according to witnesses. In the end, only Mr. Pemberton's fellow inmates tried to get medical help for him. But their efforts, like Mr. Pemberton's, fell on deaf ears.

4.     Throughout his two-week incarceration, Mr. Pemberton received no medical help at all for the growing infection in his body. He was provided no antibiotics by nurses, including Nurse Massengale, was not seen by a physician, and was not transported to a hospital. Instead, weary of his cries and screams, Corrections Officers moved him into an isolation-cell known as "the hole" simply to insure that his constant cries and screams would be less of a disturbance to Corrections Officers and inmates.

5.     After several days in Jail, Mr. Pemberton's condition was such that he could not walk without assistance to the restrooms or to the shower. He was, according to witnesses, "getting around like a 90-year old man." Eventually, Mr. Pemberton could not even make it over to the POD

door to receive food or his prescription medicine. Ultimately, in his last days, Mr. Pemberton could not even get himself out of the bed, but had to be helped and sometimes carried by Corrections Officers. Eventually, he lost his appetite and stopped eating and began urinating and defecating on himself, as his organs began to shut down. On one occasion, Sargent Mason came into his cell, lifted the slightly-built man up off of his bed, put him in a restraint chair, and rolled him – in the restraint chair – to another part of the jail.

6.     Worse still, Corrections Officers appear to have recognized that Mr. Pemberton had a serious medical problem, described by Officer Brown as "an infection." However, rather than provide Mr. Pemberton with antibiotics or other adequate medical attention, they instead moved him into "the hole." According to witnesses, Mr. Pemberton was in "the hole" – on this first of multiple occasions – for approximately a week.

7.     According to other inmates, when Mr. Pemberton was moved back into his cell from "the hole," he appeared to be "doing better." Then, he stopped eating and continued to complain to Corrections Officers about the awful pain in his left leg. After a couple of days, says one inmate, "it got to where he couldn't do anything." At this point, after several complaints, Corrections Officers "finally came in to check on him . . . and basically carried him out of the cell and again put him in the 'hole'." Mr. Pemberton "begged for medical attention the whole time he was there."

8.     On July 18, 2016, after the inmates' evening meal, a Corrections Officer attempted but could not wake Mr. Pemberton. Emergency medical personnel were called and advised Officer Brown, who was, upon information and belief, the officer-in-charge at the jail, that Mr. Pemberton required immediate hospitalization. Despite hearing this, Officer Brown would not allow them to transport Mr. Pemberton to the hospital.

9.      On July 20, 2016, Deputy Derek Phillips found Mr. Pemberton unconscious, not breathing, lying naked in his own urine and excrement on the floor of his cell. Deputy Phillips called for Officer Brown.  In the minutes which followed, Corrections Officers at the Jail made no fewer than four telephone calls to various supervisors, purportedly to get authorization about what to do with Mr. Pemberton.  Over the telephone, Officer Brown eventually then discussed Mr. Pemberton's condition with a physician who, not surprisingly, instructed her to get him to the hospital.  Yet, Officer Brown ordered two trusties[1] to drag Mr. Pemberton's comatose body to the showers, clean him up, and put him in a chair.  Only then did Officer Brown call for an ambulance.

10.     Emergency medical personnel arrived and performed CPR on Mr. Pemberton.  They were able to regain a pulse  and intubated Mr. Pemberton.  He was then transported via ambulance to North Knoxville Medical Center ("NKMC"), where doctors initially diagnosed Mr. Pemberton as suffering from an intra-cranial hemorrhage, intra-cranial bleed, sub-dural, hypotension, and cardiac arrest.  They also determined that Mr. Pemberton required a higher level of care, including neurosurgery, and arranged for a transfer to The University of Tennessee Medical Center ("UTMC") in Knoxville.

11.     Upon his arrival at UTMC, Mr. Pemberton had no brain activity.  UTMC emergency department records indicate he had suffered multiple intra-cerebral hemorrhages.  After assessing Mr. Pemberton's injuries, incorrectly believing he had been assaulted, a UTMC neurosurgeon performed a craniotomy, opening Mr. Pemberton's skull to attempt emergent-decompression of his brain stem.  As it turns out, Corrections Officers, including Deputy Phillips and Officer Brown,

---

[1] A trusty is a prisoner or convict considered trustworthy and allowed special privileges. https://www.merriam-webster.com/dictionary/trusty.

-4-

among others, had grossly misrepresented and withheld the nature of Mr. Pemberton's medical condition to medical professionals treating Mr. Pemberton, *i.e.*, they inexplicably failed to inform them that he had been sick for almost two weeks with severe pain, a high fever, unable to walk, unable to get out of bed, unable to eat, unable to control his bodily functions, and had just two days before been found unconscious in his cell.

12. Despite this and other life-saving efforts, Mr. Pemberton never regained consciousness. His family was soon informed that he was brain-dead, and at 3:28 p.m. on July 20, 2016, Mr. Pemberton was pronounced dead by UTMC Dr. Jace M. Perkerson.

13. Laboratory results established that Mr. Pemberton was suffering from Methicillin-Resistant Staphylococcus Aureus ("MRSA"). An autopsy requested by Dr. Perkerson was performed two days after Mr. Pemberton's death and revealed that Mr. Pemberton's body was littered with visible signs of necrosis and attributed his death to septic endocartitis, or MRSA. Significantly, MRSA is treatable if given antibiotics or other appropriate and timely medical care.

14. From the minute he was processed and booked at the Scott County Jail, Mr. Pemberton's complaints of pain and requests for medical attention were altogether disregarded by Corrections Officers and Jail nurses. Upon information and belief, every Corrections Officer who came into contact with Mr. Pemberton during this two-week incarceration, and particularly the Jail nurses, were deliberately indifferent to Mr. Pemberton's rapidly-devolving medical condition.

15. Based on Mr. Pemberton's autopsy alone, he would have been comatose when transported to NKMC from the Scott County Jail. He certainly would not have been able to walk or talk immediately before being found comatose (as some Correctional Officers subsequently reported). Thus, statements by various Corrections Officers, including Officer Brown, Deputy

-5-

Boshears, and Deputy Amy Nicely, that Mr. Pemberton was "alert," "conscious," "asking for a shower," and that his medical status was "good" a mere *fifteen minutes* before he was transported to the hospital are gross misrepresentations and part of a larger scheme by two or more Corrections Officers to conceal and to cover-up the circumstances surrounding Mr. Pemberton's incarceration and liability for his ultimate death.[2]

16. During his entire confinement at the Scott County Jail, Mr. Pemberton would have had noticeable and obvious symptoms – if not of infection, then of a serious medical problem – that any trained corrections officer or nurse would have surely recognized. Despite his plain and obvious physical infirmities, *i.e.*, serious infections notable to reasonably-trained corrections officers, much less trained nurses, not one officer made a serious effort to assist him or provide any, much less adequate medical treatment to him.

17. The circumstances alleged in this Complaint demonstrate that Corrections Officers and Jail nurses at the Scott County Jail lack sufficient training to recognize and/or appreciate serious medical conditions of inmates. This lack of sufficient training contributed to the overall gross neglect Mr. Pemberton experienced during his incarceration, as well as his eventual death.

18. Mr. Pemberton should have been safe and protected in the custody of law enforcement officers. Instead, he was grossly neglected, his increasingly worsening medical condition ignored, caused to suffer unbearable pain, inhuman indignities, and substantial mental

---

[2]This collusion also includes efforts by at least two Corrections Officers to conceal the fact that Mr. Pemberton repeatedly asked for help, but all of his pleas for help – and those of other inmates on his behalf – invariably fell on deaf ears. Upon information and belief, this collusion began shortly after Mr. Pemberton was taken away from the Scott County Jail to the hospital and includes efforts by Correction Officers to make their stories appear consistent and to grossly embellish the actual facts.

-6-

anguish – all at the hands of the Defendants named herein. For all of this, Plaintiff seeks compensatory and punitive damages.

19.    The Defendants violated Mr. Pemberton's clearly-established constitutional rights to adequate medical care and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments.

20.    The moving force, however, behind the violations of Mr. Pemberton's constitutional rights was Scott County's and ACH's policies, customs, or practices of deliberate indifference to the serious medical needs and conditions of inmates.

21.    Defendants knew, by Mr. Pemberton's repeated complaints, obvious signs and symptoms of a serious medical condition, and the complaints of other inmates on his behalf, that Mr. Pemberton suffered from a serious medical condition.

22.    Defendants were all required to take reasonable measures to guarantee the safety of all inmates and have a duty to protect them from harm. Here, they failed to take any such measures to protect Mr. Pemberton. Therefore, Plaintiff alleges claims for:

> ■ Count One – the failure of Scott County Sheriff's Department Corrections Officers and ACH nurses to provide adequate medical care to Mr. Pemberton;

> ■ Count Two – the failure to train and supervise officers in the provision of adequate medical care and acquiescing and ratifying unconstitutional conduct of subordinates;

> ■ Count Three – the failure to protect Mr. Pemberton from harm;

> ■ Count Four – the policy or custom of Scott County (including the Scott County Sheriff's Department) of deliberate indifference to providing adequate medical care to inmates;

-7-

- Count Five – the policy or custom of Scott County of failing to train and supervise officers in the provision of adequate medical care to inmates, and ratification of unconstitutional conduct of subordinates;

- Count Six – the cruel and unusual use by Scott County (including the Scott County Sheriff's Department) of "the hole" to isolate seriously-ill inmates without adequate medical care;

- Count Seven – the policy or custom of ACH of deliberate indifference to providing adequate medical care to inmates;

- Count Eight – wrongful death; and

- Count Nine – outrageous conduct.

23.     Plaintiff requests compensatory and punitive damages, as well as attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II.   JURISDICTION AND VENUE

24.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under the Constitution of the United States and 42 U.S.C. § 1983.

25.     This Court has supplemental jurisdiction over any claims brought under Tennessee law pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

26.     Venue lies in the United States District Court for the Eastern District of Tennessee because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Scott County.  28 U.S.C. § 1391(b)(2).

-8-

## III.  PARTIES

### A.  Plaintiff

27.     Plaintiff, Donna Jean Sexton-Pemberton ("Plaintiff"), is the lawful and duly appointed Administratrix and personal representative of the Estate of her late son, Benny Shane Pemberton.  During all relevant times, Plaintiff and Benny Shane Pemberton were citizens and residents of Scott County, Tennessee.

### B.  Defendants

28.     Scott County, Tennessee ("Scott County") is a governmental entity and political subdivision of the State of Tennessee, duly organized.  It may be served through its chief executive officer, County Mayor Dale Perdue, at the Scott County Office Building, 2845 Baker Highway, Huntsville, TN 37756.

29.     Scott County possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment and removal of individual members of the Sheriff's Department, and to assure that said actions, policies, rules, regulations, practices and procedures of the Sheriff's Department and its employees and agents comply with the laws and constitutions of the United States and of the State of Tennessee.

30.     Scott County and the Sheriff's Department are answerable for the safekeeping of persons in their custody and responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

-9-

31.     The Scott County Jail, located at the Scott County Justice Center in Huntsville, Tennessee, was built in 2008 and has a capacity for 126 inmates.  The Jail includes administration, support, and inmate housing areas.  The support area of the building houses the intake, kitchen, laundry, medical suite, jail administration functions and inmate visitation.  The minimum security inmate housing area, located south of the administration, is a single-story building which holds the inmate dormitory, control area for the guards, and a receiving area.

32.     At all times relevant to this Complaint, Defendant, Sheriff Ronnie Phillips ("Sheriff Phillips") was the duly-elected Sheriff of Scott County, Tennessee, statutorily responsible for the screening, hiring, firing, training and the supervision of  Sheriff's Department personnel; and responsible for the safety and welfare of those in custody.  Sheriff Phillips is sued in his individual capacity and as principal on his official bond.  Sheriff Phillips was operating under color of law.  Sheriff Phillips is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Sheriff's Office, Scott County Justice Center,  535 Scott Highway, Huntsville, TN 37756.

33.     At all times relevant to this Complaint, Defendant, Tommy Silcox, ("Chief Deputy Silcox"), was employed by the Scott County Sheriff's Office as Chief Deputy.  Chief Deputy Silcox is sued in his individual capacity and as principal on his official bond.  Chief Deputy Silcox was operating under color of law.  Chief Deputy Silcox is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

34.     At all times relevant to this Complaint, Defendant, Randy Lewallen, ("Detective Lewallen"), was employed by the Scott County Sheriff's Office as Chief Detective.  Detective

-10-

Lewallen is sued in his individual capacity and as principal on his official bond. Detective Lewallen was operating under color of law. Detective Lewallen is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

35.     At all times relevant to this Complaint, Defendant, Sargent Shane Mason ("Sargent Mason"), was employed by the SCSD as deputy, jail guard, and/or corrections officer. Sargent Mason is sued in his individual capacity and as principal on his official bond. Sargent Mason was operating under color of law. Sargent Mason is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

36.     At all relevant times to this Complaint, Defendant, Corrections Officer ("CO") Brittney Brown ("Officer Brown"), was employed by the Scott County Sheriff's Office as deputy, jail guard, and/or corrections officer. Officer Brown is sued in her individual capacity and as principal on her official bond. Officer Brown was operating under color of law. Officer Brown is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

37.     At all relevant times to this Complaint, Defendant, Deputy Derek Phillips ("Deputy Phillips"), was employed by the Scott County Sheriff's Office as deputy, jail guard, and/or corrections officer. Deputy Phillips is being sued in his individual capacity and as principal on his official bond. Deputy Phillips was operating under color of law. Deputy Phillips is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

-11-

38.     At all relevant times to this Complaint, Defendant, Deputy Lee Johnson ("Deputy Johnson"), was employed by the Scott County Sheriff's Office as deputy, jail guard, and/or corrections officer. Deputy Johnson is being sued in his individual capacity and as principal on his official bond. Deputy Johnson was operating under color of law. Deputy Johnson is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

39.     At all relevant times to this Complaint, Defendant, Deputy Tanner Boshears ("Deputy Boshears"), was employed by the Scott County Sheriff's Office as deputy, jail guard, and/or corrections officer. Deputy Boshears is being sued in his individual capacity and as principal on his official bond. Deputy Boshears was operating under color of law. Deputy Boshears is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

40.     At all relevant times to this Complaint, Defendant, Deputy Amy Nicely, was employed by the Scott County Sheriff's Office as deputy, jail guard, and/or corrections officer. Deputy Nicely is being sued in her individual capacity and as principal on her official bond. Deputy Nicely was operating under color of law. Deputy Nicely is, upon information and belief, a citizen and resident of Scott County and may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

41.     At all relevant times to this Complaint, Defendant, Advanced Correctional Healthcare, Inc. ("ACH"), was an Illinois corporation, with its principal place of business at 3922 Barring Trace, Peoria, IL 61615-2500 licensed to do business in the State of Tennessee. At all times mentioned herein, ACH employed, was responsible for the establishment of policies, either formally

-12-

or by custom for, and was responsible for the employment, training, supervision and conduct of its health care professionals providing medical care at the Scott County Jail, including the medical staff named as Defendants herein. ACH can be served through its registered agent for service of process, C T Corporation System, 800 S. Gay St., Ste. 2021, Knoxville, TN 37929-9710.

42.     At all relevant times to this Complaint, Defendant, Brittany Massengale, LPN, was servicing the Scott County Jail as an employee of Defendant, Advanced Correctional Healthcare, an independent medical provider for the Scott County Jail. Nurse Massengale violated Mr. Pemberton's civil and constitutional rights as set forth below. At all times material hereto, and upon information and belief, Nurse Massengale was acting under color of state law and is subject to this action pursuant to 42 U.S.C. §1983. Nurse Massengale may be served with process at the Scott County Jail, 535 Scott Highway, Huntsville, TN 37756.

43.     Plaintiff also sues the fictitious Defendants, John and Jane Does 1-10, as their true identities and/or capacities and/or other facts showing their culpability are presently unknown. These Defendants are sued in their individual capacities as Scott County Sheriff's Office officers, deputies, or employees, and as principals on their official bonds. They include any unknown officers or deputies of the Scott County Sheriff's Office who failed to provide adequate medical care to Mr. Pemberton, subjected him to cruel and unusual punishment, failed to protect him from harm and/or failed to insure that he received medical attention, and failed to train or supervise such officers in the provision of adequate medical care or the proper use of "the hole."

44.     Plaintiff also sues the fictitious Defendants, Does 11-15, as their true identities and/or capacities and/or other facts showing their culpability are presently unknown. These Defendants are

-13-

sued in their individual capacities as ACH employees.[3] They include unknown employees who failed to provide adequate medical care to Mr. Pemberton, subjected him to cruel and unusual punishment, failed to protect him from harm and/or failed to insure that he received medical attention.

45.     Various persons or entities not made Defendants in this lawsuit, including but not limited to Scott County officials or Scott County Sheriff's Office employees, have participated with Defendants in the violations asserted in this Complaint and have performed acts and made statements in furtherance thereof.

## IV.   FACTUAL ALLEGATIONS

### A.     Mr. Pemberton Is Jailed and Exhibits Symptoms of a Serious Illness.

46.     On July 6, 2017, Benny Shane Pemberton ("Mr. Pemberton") was arrested on a Florida warrant for failure to pay child support. He was booked in the Scott County Jail on a $200 bond.

47.     According to his family, Mr. Pemberton had been fighting drug addiction for a while.

48.     Within a couple of days of being booked, Mr. Pemberton began to experience symptoms of a serious medical problem, feeling sick. He had a two-inch long deep cut on the top of his left foot and an unbearable pain in his left leg. Mr. Pemberton told Corrections Officers and nurses that he had a "serious medical problem."

_____

[3]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiff will seek leave of this Court to amend her Complaint to set forth the true names and capacities of such Defendants when their identities are ascertained.

-14-

**B. Mr. Pemberton Is Infected With MRSA – a Potentially Fatal Bacteria.**

49.     The medical problem was later discovered by doctors to be septic[4] endocartitis caused by a bacterial infection, specifically, Methicillin-Resistant Staphylococcus Aureus ("MRSA").

50.     According to the Center for Disease Control, MRSA is a strain of staph bacteria that can cause infection.  [https://www.cdc.gov/mrsa/].  Usually, antibiotics are used to kill bacteria.  However, MRSA bacteria are resistant to the common antibiotics used to treat staph infections.  Bacteria may get into your skin or soft tissue through a cut, sore, or incision.[5]

---

[4]According to the Center for Disease Control, sepsis is a complication caused by the body's overwhelming and life-threatening response to infection.  It can lead to tissue damage, organ failure, and death.  Common infections, like skin infections, can lead to sepsis.  An infection occurs when germs enter a person's body and multiply, causing illness, organ and tissue damage, or disease.  [https://www.cdc.gov/sepsis/index.html].  People with sepsis are treated in the hospital.  [*Id*.] Doctors treat sepsis with antibiotics as soon as possible.  Many patients receive oxygen and intravenous (IV) fluids to maintain normal blood oxygen levels and blood pressure.  Other types of treatment, such as assisting breathing with a machine or kidney dialysis, may be necessary. Sometimes surgery is required to remove tissue damaged by the infection. [https://www.cdc.gov/sepsis/index.html].

[5]At this time, Plaintiff is not alleging that Mr. Pemberton contracted MRSA at the Scott County Jail.  The Mayo Clinic states that "outbreaks of MRSA have occurred in military training camps, child care centers and jails." [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/risk-factors/con-20024479]. According to www.drugs.com, risks for MRSA are increased by:

- Touching the infected skin of someone who has MRSA;

- Living in the same household as someone with MRSA;

- History of MRSA infection;

- Use of personal items such as towels, razors, or clothes of someone with MRSA;

- Touching items such as doorknobs that have MRSA bacteria on it;

- Being in crowded places where germs can be spread such as

-15-

51.     MRSA infections can resist the effects of many common antibiotics, so they are more difficult to treat.  MRSA infections may affect the bloodstream, lungs, heart, bones, and joints. [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/complications/con-20024479].

52.     Notwithstanding the seriousness of MRSA, the bacteria still responds to certain antibiotics, and in some cases, antibiotics may not be necessary.  For example, according to The Mayo Clinic, doctors may drain a superficial abscess caused by MRSA rather than treat the infection with drugs. [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/treatment/con-20024479].

### C.     Each Hour, Mr. Pemberton's Medical Condition Was Getting Progressively Worse.

53.     His condition worsening by the hour, Mr. Pemberton began complaining repeatedly to Corrections Officer Brown, Deputy Phillips, Deputy Johnson, Deputy Nicely, Deputy Boshears, Sargent Mason, other unidentified Corrections Officers (John and Jane Does 1-10), as well as Nurse Massengale, and other nurses (John and Jane Does 11-15), about severe pain and swelling in his left foot and leg, then a fever.[6]

---

hospitals, daycare facilities, or locker rooms;

■ Taking antibiotics frequently, stopping antibiotics, or missing doses of antibiotics.

[https://www.drugs.com/cg/mrsa-methicillin-resistant-staphylococcus-aureus.html].

[6]If anyone had actually taken Mr. Pemberton's temperature, they would have found that he had a fever.

-16-

54.     Within a couple of more days, Mr. Pemberton was experiencing so much pain in his leg that he was repeatedly hitting the "call" button to summon officers to his cell to tell them about his leg and screaming in pain for help and medical attention.  Other inmates began calling to get Mr. Pemberton "help."

**D.      "He Was Very Sick.  He Was Very Very Sick."**

55.     By this time, the infection had spread through other organs of Mr. Pemberton's body and he was not receiving any treatment whatsoever to abate it.  He was complaining of a fever, his legs were weak, he was not eating well, if at all, and did not have an appetite.  One medical professional who examined Mr. Pemberton stated that during this period, "he was very sick.  He was very very sick."

56.     During this period, Mr. Pemberton also began having even more difficulty walking without assistance.  Initially, he was unable to walk unaided to the restrooms or to the showers.  But he kept getting worse.  Eventually, he was unable to walk to the door of his own cell to retrieve food or medicine.

**E.      Corrections Officers Move Mr. Pemberton to "the Hole."**

57.     At this point, still in his first week of incarceration, jail supervisors, including, upon information and belief, Officer Brown and Sargent Mason, and jail nurses, including, upon information and belief, Nurse Massengale, directed that Mr. Pemberton be moved to "the hole," an isolation cell.  An inmate stated that "they took him to the 'hole' for about a week" and explained to others that he was "just de-toxing."

58.     Plaintiff telephoned the Scott County Jail repeatedly during her son's incarceration.  Typically, she talked to Officer Brown.  Each time, she was told by Officer Brown (or another

-17-

Corrections Officer) that her son was "fine" and (other than the alleged infection on his chest) had reported "no medical problems."

59.     While in "the hole," Mr. Pemberton – in immense pain and suffering an unusually high fever  due to the worsening infection in his left foot that by now had spread to his leg – continued to cry and scream for someone to help him.  He was unable to walk and had mostly stopped eating.

**F.     Inmates Describe Mr. Pemberton As "Getting Around Like a 90-Year Old Man."**

60.     Other inmates described Mr. Pemberton's condition and situation early on during his incarceration:

- he was "a very sick man;"

- "people had to help him get around in and out of shower;"

- "he was getting around like a 90-year old man and when they came in the second time to get him they had to pretty much carry him out;"

- "could not even walk on his own to the restroom/showers" or even to "the POD door to receive meds and ask for help;"

- one day, Mr. Pemberton "hit the button and asked for help and they came back here laughing and making fun of him;" and

- another time, Sargent Mason, who had actual knowledge of Mr. Pemberton's devolving medical condition (he knew Mr. Pemberton could not even walk on his now by now), had to "help Mr. Pemberton out of his bed."  Sargent Mason had another officer "roll" a restraint chair back to the cell and Mason carried Mr. Pemberton to the cell door and put him in the restraint chair.

-18-

**G.   Mr. Pemberton Received No Form of Medical Treatment at the Scott County Jail for the Infection Spreading Through His Body.**

61.    Through it all, Mr. Pemberton was never given the slightest form of medical attention by Scott County Jail nurses or Corrections Officers.  His foot and leg were never examined by a nurse or physician and the infection was never treated with so much as an over-the-counter topical ointment, much less antibiotics.  He was not seen or examined by a medical doctor or taken to a hospital until he was comatose.

62.    Physicians who subsequently treated Mr. Pemberton on July 20, 2017, multiple laboratory test results from NKMC and UTMC, and the Knox County Chief Medical Examiner make clear that Mr. Pemberton's infection was not treated by anyone, at anytime, during the full length of his incarceration.

63.    The moment the infection began to spread beyond Mr. Pemberton's left foot, someone should have stepped up and given him strong antibiotics.  They did not do this.

**H.   "It Got to Where He Couldn't Do Anything"**

64.    After about a week, Corrections Officers brought Mr. Pemberton back from "the hole."  At that point, he then "quit eating and was complaining about his leg."  He still could not walk without assistance.  One inmate describes where Corrections Officers "actually had to help him to court."

65.    After this, inmates say that "it got to where he couldn't do anything."  But Mr. Pemberton still kept crying for someone to help him.  In response to his cries for help, and notwithstanding several other complaints by inmates on his behalf, instead of rendering any type of medical aid to Mr. Pemberton, Corrections Officers, including Officer Brown, directed that he be moved again, and  "carried him out of the cell and again put him in 'the hole.'"  This last move to

-19-

"the hole" (along with the initial move to "the hole") appears to have been made because Mr. Pemberton was constantly screaming so loud for help that Corrections Officers wanted to put him in the most secluded cell possible to lessen the disruption.

**I.**     **Mr. Pemberton "Begged for Medical Attention the Whole Time He Was There."**

66.     According to several inmates, Mr. Pemberton "begged for medical attention the whole time he was there [in the Jail]." One concerned inmate summoned Nurse Massengale over to check on Mr. Pemberton because he was in such bad shape and she absurdly remarked, "oh, as long as it doesn't go to your heart you'll be fine." That was the extent of medical "help" she provided.

67.     By the last few days of his life, Mr. Pemberton was an invalid. He could not walk. He could not get out of bed. He could not eat. He could not go to the restroom or the showers without being carried there. Corrections Officers had no desire to help Mr. Pemberton perform any of these necessary tasks. Consequently, in his last few days, as Mr. Pemberton's organs were beginning to shut down, he inevitably urinated and defecated on himself, and begged Corrections Officers to please take him to the showers and help him get "cleaned up." That too, they repeatedly refused to do.

**J.**     **Even on the Last Three Days of Mr. Pemberton's Life, as the Infection Had Likely Entered His Brain and Multiple Organs, Corrections Officers Failed to Help Him.**

68.     It was, as one medical professional described it, a "wicked infection," requiring hospitalization and IV antibiotics.

69.     By Monday evening, July 18, 2016, an inmate heard a Corrections Officer, upon information and belief, Deputy Phillips, "yelling to try and wake up" Mr. Pemberton. Corrections Officers called Emergency Medical Services. The EMS technicians informed a "woman officer,"

-20-

upon information and belief, Officer Brown, that Mr. Pemberton's condition required that he be immediately taken to the hospital. In response, Officer Brown said "no." Mr. Pemberton was left in his cell, as the infection continued to spread through his body and shut down his organs.

70. By Tuesday evening, July 19, 2016, an inmate was coming into the jail and heard Mr. Pemberton "yelling for help." The Corrections Officer accompanying the inmate responded that it was "just some Xanax junkie." The inmate states that he was in the booking area for "a good while" and Mr. Pemberton "screamed for help and nothing was done to help him."

71. This was not at all unusual, as numerous inmates repeated this scenario, *e.g.*, Mr. Pemberton "repeatedly asked for medical attention which he was denied" and Mr. Pemberton "asked over and over for medical attention" but "was denied." At no time during his two-week incarceration in the Scott County Jail did Corrections Officers or medical personnel ever provide Mr. Pemberton with medical care, medicine, or antibiotics of any type.

**K.    Mr. Pemberton Is Found Naked and Comatose in His Cell in His Own Urine and Excrement.**

72. According to reports by Corrections Officers, including Officer Brown, Officer Phillips, Officer Johnson, Officer Nicely, Officer Boshears, and an unidentified officer, at about 1:00 a.m. on Wednesday, July 20, 2016, Deputy Phillips went to complete an "hourly security check" on Mr. Pemberton. According to those reports, Deputy Phillips found Mr. Pemberton lying on his back on the cell floor "with urine and human fecies under him."

73.     According to the reports, Mr. Pemberton was found "conscious but not responsive." Instead of immediately calling E-911, according to her own report and others, Officer Brown instructed two jail trusties (identified as "Clark" and "Brinker") to help Mr. Pemberton to the shower "to wash himself."[7]

74.     During this period, Corrections Officers made at least four telephone calls to supervisors to get instructions. Eventually, Deputy Boshears called Dr. Edward Caperelli, a family medical practitioner in Oneida, Tennessee, and handed the phone to Officer Brown. Dr. Caperelli reportedly instructed Officer Brown to take Mr. Pemberton to the hospital.[8]

75.     Officer Brown reports that Mr. Pemberton "was helped to quickly shower, he was lying on the floor and his breathing was unevenly spaced at low rates." Of course, at this point, Mr. Pemberton could not help himself do anything, as his brain was by now disintegrated by the infection. Only then, according to Officer Brown, did she order Deputy Phillips to call EMS. Officer Brown reports (again falsely, as Mr. Pemberton was by then comatose) that Mr. Pemberton was "conscious but not responsive to verbal interaction."

76.     According to Officer Brown, EMS arrived and began stabilizing Mr. Pemberton for transport to the emergency room. Medical records from North Knoxville Medical Center ("NKMC") show that EMS performed CPR and were able to regain a pulse. They also appear to have

---

[7]According to one inmate, Officer Brown told other officers to "bring him [Mr. Pemberton] out [of his cell]." "They carried him out" and the inmate saw that he was "stiff" and his eyes were "glazed over." Officer Brown told them to "clean him up and put him in "the chair" used for "problem inmates." EMS was not called until Mr. Pemberton was placed in the chair.

[8]According to another Correction Officer's report, Dr. Caparelli stated that "since inmate Pemberton had been doing this in the past and since he was escalating we would have to take him to the emergency room."

-22-

administered Nalaxone, believing, through the false representations of Corrections Officers, that Mr. Pemberton had overdosed on opioids. However, Mr. Pemberton was still unable to breathe on his own and was placed on a ventilator.

**L.     Mr. Pemberton is Treated at NKMC and Transferred**

77.     Mr. Pemberton arrived at the NKMC Emergency Department on July 20, 2016 at 2:34 a.m.[9] Records indicate that the medical staff immediately recognized his condition as "critical." The initial diagnosis from Dr. Travis Fawver, DO, was that Mr. Pemberton had suffered an "intra-cranial hemorrhage, intra-cranial bleed, subdural, hypotension, and cardiac arrest."

78.     Medical records from NKMC also indicate that Dr. Fawver was told by Deputy Phillips that Mr. Pemberton "was found unresponsive in his jail cell and had urinated and defecated on himself." Deputy Phillips also stated that Mr. Pemberton "was alert and oriented 15 minutes before patient was found." Those medical records further state that Mr. Pemberton "has not recently seen a physician."

79.     It was determined that Mr. Pemberton required a higher level of care (neurosurgery) and it was ordered that he be transferred to The University of Tennessee Medical Center in Knoxville ("UTMC").

80.     Laboratory results from tests performed at NKMC of Mr. Pemberton's blood and tissue revealed "gram positive cocci, in clusters," and staphylococcus aureus. A computed tomography ("CT") of Mr. Pemberton's brain revealed a

---

[9]Despite being a bail bondswoman and regularly doing business at the Scott County Jail, Plaintiff was not notified by the Scott County Sheriff's Office of her son's situation. Instead, she was contacted by NKMC staff nearly four hours after her son was found.

"4.1 x 3.5 cm hemorrhagic lesion within the right cerebellum, w/fluid level. A 2nd 3.1 x 3.1 cm hemorrhagic lesion is present within the left occipital lobe, as well as "hemorrhagic masses within the right cerebellar hemisphere and left occipital lobe the right cerebellar lesion appears to be actively bleeding."

**M.    On Arrival at UTMC, Mr. Pemberton Is Likely Brain-Dead, But Physicians Attempt to Save Him Via Brain Surgery.**

81.    By the time Mr. Pemberton arrived at UTMC via Rural Metro Ambulance Services, the medical staff were already fearing that Mr. Pemberton was possibly "already brain dead." His body-temperature was abnormally low. Indeed, it would have been severely low a day or two before his death, as he was becoming hypothermic on the verge of death and his organs would have been shutting down.

82.    Doctors originally believed the bleeding in Mr. Pemberton's brain could have been trauma-related. However, it was actually a hemorrhagic abscess from the infection. Dr. Christopher Gallati, a neurosurgeon at UTMC, performed a "suboccipital craniectomy for evacuation of posterior fossa hemorrhage (to try to decompress brain stem)."

83.    Despite numerous life-saving efforts by UTMC physicians, it was ultimately determined that Mr. Pemberton had suffered brain death. His family was informed of his condition, and at 3:28 p.m. on July 20, 2016, UTMC Dr. Jace Perkerson pronounced Mr. Pemberton's death and requested autopsy.

**N.    Autopsy Reveals That the MRSA Had Entered Mr. Pemberton's Brain, Heart, and Multiple Other Organs.**

84.    An autopsy was performed on July 22, 2016 by Dr. Darinka Mileusnic, M.D., Ph.D., the Chief Medical Examiner for Knox County. Dr. Mileusnic concluded that Mr. Pemberton had

-24-

died of septic[10] endocartitis (Methicillin-Resistant Staphylococcus Aureus). Among other things, she also found:

- "grossly visible pattern of necrosis;"[11]

- "brain abscess;"

- "left foot abscess with deep subcutaneous necrosis;"

- massive tissue abscesses in multiple organs and tissues, "including septic myocarditis with multiple abscess formations. All sampled abscesses reveal central necrosis with multiple massive bacterial colonies."

85.    According to Dr. Mileusnic, the infection began in Mr. Pemberton's left foot, moved up his left leg, and ultimately, moved into his brain.

86.    Summarizing Dr. Mileusnic's findings and conclusions relative to Mr. Pemberton's central nervous system, the autopsy states:

There is a subdural blood clot in the occipital region, which is approximately 20 grams in total weight. The brain weighs 1,530 grams. There is severe brain edema manifested by flattening of the gyri, uncal notching, and cerebellar tonsillar herniation. There is marked softening of the basillar structures of the brain, in addition to a dusky discoloration of the arachnoid membranes and the superficial

_____

[10]According tio the Center for Disease Control, sepsis is a complication caused by the body's overwhelming and life-threatening response to infection. It can lead to tissue damage, organ failure, and death. Common infections, like skin infections, can lead to sepsis. An infection occurs when germs enter a person's body and multiply, causing illness, organ and tissue damage, or disease. [https://www.cdc.gov/sepsis/index.html]. People with sepsis are treated in the hospital. [*Id.*] Doctors treat sepsis with antibiotics as soon as possible. Many patients receive oxygen and intravenous (IV) fluids to maintain normal blood oxygen levels and blood pressure. Other types of treatment, such as assisting breathing with a machine or kidney dialysis, may be necessary. Sometimes surgery is required to remove tissue damaged by the infection. [https://www.cdc.gov/sepsis/index.html].

[11]According to various medical journal Necrosis – the death of most or all of the cells in an organ or tissue due to disease, injury, or failure of the blood supply.

cerebral cortex, consistent with anoxic encephalopathy. A thin layer of subarachnoid hemorrhage lines the left cerebral hemispheric convexity and spreads over the base of the brain. There is extensive hemorrhage around the cerebellum. Surgical foam and hemostatic material covers the posterior cerebellum and the vermis between the cerebellar hemispheres. There is a hemorrhagic abscess with the central ischemic formation in the bilateral cerebral poles. The larger area of involvement is visualized in the left cerebellar hemispheres. A similar-appearing hemorrhagic abscess with the central ischemic necrosis and infarction is observed in the left occipital pole and measures 4.0 centimeters in greatest dimension. Serial coronal sectioning of the brain demonstrates scant bilateral intraventricular hemorrhage.

87. The infection even went to his heart. In addition to his brain and heart, the autopsy found septal abscesses in Mr. Pemberton's liver, both kidneys, spleen, and pancreas. Dr. Mileusnic's report reveals that part of Mr. Pemberton's brain was basically disintegrated due to the infection. According to the autopsy, there would have been pus everywhere, not only in Mr. Pemberton's brain, but throughout his body, along with "massive bacterial colonies." Obviously, this did not happen overnight. Rather, according to one medical professional who examined Mr. Pemberton, "it would have taken days to get that amount of infection all over the body."[12]

88. Given Mr. Pemberton's signs, symptoms, and daily-devolving physical condition, how did anyone at the Scott County Jail, especially Advanced Correctional Healthcare ("ACH") nurses, like Nurse Massengale, fail to notice that Mr. Pemberton was seriously ill? The answer, of course, is that they did know. Still, they did nothing at all to help him, regardless of how sick he became. And he was very sick:

---

[12]As for whether MRSA had its origins in Mr. Pemberton's past drug use or played any role in his death, Dr. Mileusnic's autopsy report seems to make it very clear that there was no abscess whatsoever associated with needle marks on Mr. Pemberton's body.

■ in immense pain due to an the infection spreading through every organ of his body;

■ carrying a high fever;

■ losing his appetite and not eating;

■ unable to walk, even to his cell door, much less to a restroom or shower;

■ unable to get out of bed and having to be carried out of bed and put into a rolling chair;

■ becoming weaker and weaker in mind and body; and finally,

■ unable to control his bodily functions such that in his last few days, he was frequently urinating and defecating on himself and asking to be cleaned up.

**O.** **Misrepresentations and Concealment By Corrections Officers and Failure to Provide Truthful Information to EMS and Hospital Medical Staff About Mr. Pemberton's Two-Week Long Serious Illness.**

89. After Mr. Pemberton was found comatose, and after his death, several Corrections Officers made statements, in writing and to physicians treating Mr. Pemberton, that indicate Mr. Pemberton was conscious, alert, lucid, and even talking just minutes before he was purportedly found unconscious in his cell. For instance:

■ Deputy Phillips falsely informed emergency medical staff at NKMC that "patient was alert and oriented 15 minutes before patient was found;"

■ Officer Brown falsely stated that "[a]ll security checks conducted throughout the night were reported as normal, the inmate was breathing and lying on his mat during each check and had been asking for a shower;" and

■ Deputy Johnson falsely stated that he "saw two trustees escorting inmate Benny Shane Pemberton to the shower."

-27-

90.     In addition, one unidentified Correction Officer reported:

■ that at approximately 6:50 p.m., Mr. Pemberton "was lying on bed mat, he was responsive and asked Deputy Tanner Boshears for a shower;"

■ that Officer Brown "completed a security check in booking at approximately [7:26 p.m.] – inmate Pemberton again asked for a shower;"

■ that Deputy Boshears "was checking on inmates and completing security check at approximately [7:55 p.m.] – we noticed he had urinated on himself. Inmate Pemberton was moved to holding 1 so we could clean his cell and because he had been yelling for an hour out through booking;"

■ that at 8:26, Officer Brown "completed security check in booking – inmate lying on his mat-inmate breathing and conscious;" and

■ that at approximately 11:57 p.m., Officer Brown "completed security check – inmate Pemberton was lying on his mat-looked at door and asked for the time and for an hour out."

91.     Of course, the majority of these representations are utterly false. After all, part of Mr. Pemberton's brain had essentially disintegrated by this point and he most certainly would not have been "talking," "yelling," or "asking for a shower" in the minutes or even hours before being found unconscious. The circumstances leading to his coma and ultimate death did not occur within minutes or even hours, but took a period of days. Yet, Corrections Officers implausibly contend that approximately sixty minutes before he was found, Mr. Pemberton "asked for the time," and even more impossibly, that he was "alert and oriented" a mere *fifteen minutes* before he was found.

92.     The autopsy report, medical records, and discussions with the medical professionals who examined him make it very clear that by the evening of Tuesday, July 19, 2016, Mr. Pemberton was medically unable to do any of the things these Corrections Officers say he did.

-28-

93.     Yet, they say it, and likely do so in an attempt to deflect or escape liability for Mr. Pemberton's death.  At least Officer Brown and Deputy Phillips, and possibly others, grossly misled medical professionals about precisely how Mr. Pemberton came to be in the condition he was in when he was found unconscious for the second time in two days.

**P.     Scott County's Refusal to Discuss the Case or to Investigate the Circumstances Surrounding Mr. Pemberton's Death**

94.     After Mr. Pemberton died, Plaintiff telephoned the Jail and spoke to Officer Brown and inquired about what had happened to her son.  Officer Brown stated that her son was found like that.  When Plaintiff called back a few days later, Officer Brown told her that nobody at the Jail could talk to her about what had happened and that she needed to speak with Sheriff Ronnie Phillips or Chief Deputy Tommy Silcox.

95.     Days after Mr. Pemberton's death, Plaintiff (his mother) met with Scott County Sheriff's Office Chief Detective Randy Lewallen ("Detective Lewallen")and Detective Eric Newport. Detective Lewallen had the preliminary autopsy report from Dr. Mileusnic on his desk and informed the Plaintiff – as he quickly tapped on the autopsy report – "right there's what happened to that boy!  All of his problems were caused by his needle marks and there will not be an investigation.  If you don't like the answers you are getting here, hire and attorney."  Upon information and belief, Sheriff Phillips and Chief Deputy Silcox approved Detective Lewallen's decision not to investigate the circumstances surrounding Mr. Pemberton's death.  Consequently, with no investigation, none of the Corrections Officers who failed to provide adequate medical care were terminated, suspended, disciplined or otherwise reprimanded.

96.     On August 24, 2016, Plaintiff made a formal written request for medical records to Scott County and ACH requesting medical records or records regarding her son's confinement,

-29-

including information and documents concerning any medical treatment provided to him at the Scott County Jail. No one at Scott County or ACH ever responded to her requests, in writing, via telephone, or otherwise. NKMC and UTMC both immediately responded and provided hundreds of pages of records.

97.     Similarly, after her son's death and after failing to receive any information from the Scott County Sheriff's Office, Plaintiff posted a request on social media (Facebook) asking anyone with information relating to her son's death to come forward and provide information. In response, Chief Deputy Silcox told Scott Pemberton (Benny Shane Pemberton's brother) if Plaintiff removed the Facebook post the Sheriff's Office would discuss what happened to her son during his confinement. She took the post down several days later, but no one at the Sheriff's Office would discuss the case with her.

98.     Corrections Officers, particularly Officer Brown and Deputy Phillips, also made misrepresentations about Mr. Pemberton's condition – and withheld pertinent information from – medical professionals responsible for treating him.

99.     The circumstances surrounding M. Pemberton's death required an investigation. Detective Lewallen emphatically declined to conduct any investigation into Mr. Pemberton's death. No Corrections Officer received any form of discipline.

**Q.      The Circumstances Require Discovery to Permit Plaintiff to More Precisely Allege Her Claims.**

100.     Due to Mr. Pemberton's death, Plaintiff was compelled to file this Complaint without the benefit of information available only to her son. Moreover, Mr. Pemberton would have been better able to identify culpable parties and describe more fully the details of his incarceration. Furthermore, Plaintiff was not permitted to talk to her son during his confinement and to learn the

-30-

precise circumstances of his treatment. Finally, more precise allegations could have been made if (a) Scott County and/or ACH had responded to Plaintiff's August 2016 records request; or (b) Scott County Sheriff Phillips, Chief Deputy Silcox, or Chief Detective Lewallen had discussed her son's incarceration with the Plaintiff. Unfortunately, all of the aforementioned Defendants failed to provide a verbal or written formal or even informal response to the requests for information.

101.   Accordingly, many of the allegations in this Complaint have been made upon information and belief after a full investigation. Consequently, more precise allegations cannot be made at this time.

## V.  WAIVER OF IMMUNITY

102.   Scott County has waived immunity for negligence of the county and county employees, misconduct of deputies acting under color of law, and for the negligence of deputies or employees of the SCSD or the county, as set out in Tenn. Code Ann. §29-20-305, and for intentional acts or misconduct done by deputies under color of law, as set out in Tenn. Code Ann. §8-8-302-302.

103.   There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VI.  CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF LAW
### 42 U.S.C. § § 1983 and 1988

### Failure to Provide Adequate Medical Care
### (Against Individual Defendants)

104.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

-31-

105.     Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the United States Constitution and federal laws.  Here, each of the Individual Defendants – along with all of the John and Jane Doe Defendants – were acting under color of state law.

106.     The Fourteenth Amendment to the United States Constitution requires that pretrial detainees be provided adequate medical care while in the custody of any governmental entity.

107.     An individual officer engages in conduct in violation of the Due Process Clause of the Fourteenth Amendment where he or she demonstrates deliberate indifference to the serious needs of a pre-trial detainee, such as Mr. Pemberton, by intentionally denying or delaying adequate medical care for said person.  Deliberate indifference may be found to exist where an officer denies or delays obtaining treatment for a pre-trial detainee under facts and circumstances that would cause a layperson to conclude medical treatment was needed.  Here,  under the facts and circumstances alleged above, a reasonable layperson would have concluded that Mr. Pemberton needed medical treatment even during his first few days of confinement.

108.     Upon information and belief, the Individual Defendants, including the John and Jane Doe Defendants, knew that Mr. Pemberton had a serious medical condition and that it was getting worse every passing day.  After all, within two days of his arrival at the Jail, Mr. Pemberton began complaining about a deep cut and pain in his left foot.  As the infection in his left foot spread to his leg and other parts of his body, Mr. Pemberton's health began a steady then rapid decline, punctuated

-32-

by increasing pain in his left leg, an unusually and consistently high fever, inability to walk, inability to get out of bed, loss of appetite, failure to eat his meals, and ultimately, the loss of all bodily functions as he began suffering multiple-organ shutdown during the second week of his confinement.

109. But all of the Defendant Corrections Officers, including the John and Jane Doe Defendants – each and every one of them – ignored Mr. Pemberton's increasingly serious then critical medical condition. At various times during his incarceration, several of the Defendant Corrections Officers laughed at Mr. Pemberton as he cried for help, responding that he was nothing but a "junkie" and that nothing was wrong with him medically, as he was "just detoxing." These remarks were made notwithstanding Mr. Pemberton's multiple symptoms of a very serious medical condition.

110. Hearing and observing the Individual Defendants disregard of Mr. Pemberton's cries for help, other inmates repeatedly complained on Mr. Pemberton's behalf. Each of the Individual Defendants were exposed to Mr. Pemberton at the Jail on a regular basis during his two-week long incarceration, hearing, seeing, and observing him during that time. It is simply implausible to believe that any of them were unaware of Mr. Pemberton's rapidly devolving medical condition.

111. Upon information and belief, all of the Individual Defendants, including the John and Jane Doe Defendants, had actual knowledge of the physical signs and symptoms of a serious illness being exhibited by Mr. Pemberton. They also had actual knowledge of, but disregarded, the serious health risks to Mr. Pemberton by failing to provide him with any semblance of medical care for a serious – and ultimately fatal – medical condition, that is, until they eventually realized, probably days too late, that his complaints were not those of a "junkie," but legitimate.

-33-

112.     Upon information and belief, all of the Individual Defendants, including the John and Jane Doe Defendants, had actual knowledge that as early as Friday, July 15, 2016, Mr. Pemberton's medical condition had so rapidly deteriorated that he began to lose control of his bodily functions, urinating and defecating on himself and begging to be cleaned up.  Nevertheless, they failed to provide him medical care.

113.     As Mr. Pemberton's body was in obvious serious physical distress, and the Individual Defendants had actual knowledge of his increasingly-ill and serious medical condition, this failure to provide medical care was knowing and intentional, not inadvertent or negligent.

114.     Significantly, MRSA still responds to certain antibiotics, and in some cases, antibiotics may not be necessary.  According to The Mayo Clinic, doctors may drain a superficial abscess caused by MRSA instead of using antibiotics. [http://www.mayoclinic.org/diseases-conditions/mrsa/basics/treatment/con-20024479].     If the Individual Defendants would have responded to Mr. Pemberton's symptoms and cries for help, or to the plea of other inmates to help him, his infection could have been treated, either with IV antibiotics or a surgical procedure, and it is likely that the infection would have been stopped before spreading to the rest of his body.

115.     One or more of the Individual Defendants also intentionally misrepresented the circumstances leading up to Mr. Pemberton's death and withheld vital information from EMS-responders (who appear to have administered Naloxone to reverse the effects of an opioid overdose only because  they were led to believe by one or more of the Individual Defendants, Officer Brown

-34-

or Deputy Phillips, that Mr. Pemberton may have overdosed) and hospital personnel. Specifically, they did not inform medical personnel that Mr. Pemberton had been very sick for about two weeks and in a rapidly devolving medical condition.

116.    A layperson would have noticed – and several of them did – that Mr. Pemberton was very sick. It did not take someone with a medical background to recognize that Mr. Pemberton was seriously ill throughout his incarceration.

117.    All of this demonstrates that each Individual Defendant's failure to attend to Plaintiff's serious medical needs or provide medical care to him constituted a violation of the Fourteenth Amendment.

118.    By not seeing to Mr. Pemberton's serious need for medical attention, the Individual Defendants, including the Jane and John Doe Defendants, allowed Mr. Pemberton's medical condition to become increasingly critical, eventually escalating into a life-threatening condition that ultimately proved fatal.

119.    The failure of the Individual Defendants, including the Jane and John Doe Defendants, to provide adequate medical care to Mr. Pemberton resulted in days of unnecessary excruciating and unbearable pain and suffering for him.

120.    If the Individual Defendants, including the Jane and John Doe Defendants, had taken Mr. Pemberton to the hospital and allowed him to be examined, medical personnel would have properly diagnosed the infection and began to effectively treat it. Instead, all of them ignored his serious medical needs and failed to provide any medical care at all, all of which made his condition

substantially worse, then one or more of them lied to medical professionals about Mr. Pemberton's condition. There is verifying medical evidence that establishes the detrimental effect of the delay in medical treatment.

121. This failure to provide medical treatment rose to a Constitutional violation. As a proximate result of the conduct of the Individual Defendants, including the Jane and John Doe Defendants, the untreated infection reulted in Mr. Pemberton's death.

122. Based on the foregoing, the Individual Defendants and certain John and Jane Doe Defendants exhibited deliberate indifference to Mr. Pemberton's serious need for adequate medical care which directly caused his death, as described herein, and they are therefore liable to Plaintiff pursuant to the provisions of 42 U.S.C § 1983.

123. Plaintiff therefore sues the Individual Defendants and the John and Jane Doe Defendants for their deliberate indifference to and violation of Mr. Pemberton's right to be provided adequate medical care for a serious medical need, and seek any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT TWO

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW

### 42 U.S.C. §§ 1983 and 1988

**Failure to Train and Supervise/Acquiescing-In and
Ratifying Unconstitutional Conduct of Subordinates
(Against Sheriff Philips, Chief Deputy Silcox,
and Chief Detective Lewallen)**

124. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

-36-

125.     Sheriff Phillips and Chief Deputy Silcox had a duty to train and supervise Corrections Officers to insure the provision of adequate medical care to inmates with serious medical needs. They failed to train and supervise the Individual Defendants, including the John and Jane Doe Defendants, properly; failed to investigate allegations of inadequate medical care; and subsequently attempted to conceal the unreasonable deprivation of medical care by refusing to conduct any investigation at all of the circumstances surrounding Mr. Pemberton's death, implausibly using Mr. Pemberton's past drug addiction as an excuse, notwithstanding the autopsy's clear exclusion of needle marks or track  as a cause.  Sheriff Phillips and Chief Deputy Silcox at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct alleged herein by signing off on the decision not to investigate and not reprimanding anyone.

126.     Sheriff Phillips and Chief Deputy Silcox had an opportunity to implement corrective action against the various officers or nurses involved, but they did not.  Instead, they implicitly authorized, approved, or knowingly acquiesced in those officers' conduct, implicitly acquiescing in the deprivation of medical care and cruel and unusual punishment as well.

127.     None of the officers whose actions resulted in Mr. Pemberton's death received disciplinary action of any kind.  No one was terminated, suspended, reprimanded, demoted, or even had so much as a warning placed in their personnel file.

128.     It is highly unlikely that the death of an inmate such as that described herein would not be reviewed by Sheriff Phillips and Chief Deputy Silcox.  Still, no investigation into the death occurred.  Sheriff Phillips was involved, at least in part, in creating and enforcing all of the Scott County Sheriff's Office's policies.  Here, he did not punish officer misconduct, but "rubber stamped" it.

-37-

129.     Ratification of the heinous conduct described herein by Sheriff Phillips and Chief Deputy Silcox sent a message to Corrections Officers and Jail nurses that they are allowed to do whatever they want, whenever they want, to whomever they want, irrespective of the United States Constitution.

130.     Defendants' actions proximately caused Mr. Pemberton's death.  The conduct of the Defendants against whom this Count is made was intentional, malicious, willful, wanton and in reckless disregard of Mr. Pemberton's constitutional rights and/or grossly negligent in that this conduct shocks the conscience and is fundamentally offensive to a civilized society, so as to justify the imposition of punitive damages on these Defendants in their individual capacities.

131.     Plaintiff therefore sues the Individual Defendants and the John and Jane Doe Defendants for their violation of Mr. Pemberton's constitutional rights, and seek any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT THREE

### VIOLATION OF FEDERAL CIVIL RIGHTS
### 42 U.S.C. §§ 1983 and 1988

### Failure to Protect
### (Against All Individual Defendants)

132.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

133.     The Individual Defendants, including the John and Jane Doe Defendants, each of whom had actual knowledge of Mr. Pemberton's serious medical needs throughout his incarceration, yet did nothing to render him aid or stop the cruel and unusual punishment, are equally liable for this violation.

-38-

134.    From the moment of Mr. Pemberton's incarceration, the Individual Defendants, including the John and Jane Doe Defendants, owed a duty of care to protect him.  Therefore, a special relationship existed between Mr. Pemberton and each of the Individual Defendants, including the John and Jane Doe Defendants, which gave rise to their duty to protect him.  They breached that duty by withholding medical care from the seriously-ill Mr. Pemberton and allowing him to be put in "the hole" as a means of punishment for merely being sick.

135.    As a direct and proximate result of the Individual Defendants',  including the John and Jane Doe Defendants, failure to protect Mr. Pemberton, Mr. Pemberton suffered needlessly throughout his confinement and ultimately died.

136.    Plaintiff therefore sues the Individual Defendants and the John and Jane Doe Defendants for their violation of Mr. Pemberton's constitutional rights, and seek any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT FOUR

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW

### 42 U.S.C. §§ 1983 and 1988

### (MONELL CLAIM)
### Failure to Provide Adequate Medical Care
### (Against Scott County)

137.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

138.    The United States Constitution requires that a pretrial detainee be provided adequate medical care while in the custody of any governmental entity.

-39-

139.    A governmental entity may be held liable based upon its officers' deliberate indifference to and violation of any citizen's constitutional rights where a custom, policy, or procedure of the municipality is found to be the proximate cause of the constitutional violation.

140.    Additionally, a governmental entity may be held liable where its supervisory officials and officers ratify an illegal action of lower-tier officers or employees or where the officials and officers at the executive level take actions that themselves constitute deliberate indifference and are the driving force behind the constitutional injury.

141.    Scott County has a history of failing to provide adequate medical care to inmates and pretrial detainees housed at the Scott County Jail.  This case is just one of *three instances in the past year* alone in which Scott County Corrections Officers or nurses' behavior are alleged to have caused or contributed to the serious injuries or death of inmates.

142.    This is not the first time, nor the second, that Scott County and ACH have allegedly failed to provide adequate medical care to inmates.  Rather, it is one of just three instances in the past year alone in which Scott County Jail employees' behavior are alleged to have caused or contributed to the serious injuries or death of inmates.

143.    First, Tammy Brawner alleges that she is a former inmate in the Scott County Jail and that she was deprived of required medicine to prevent seizures and was also tased after being accused of "faking" the seizures. *Brawner, et al.  v. Scott County, et al.*, No. 3:17-cv-00108-JRG-HBG, Doc. 8, at Page ID#: 89-118 (E.D. Tenn. March 31, 2017).  Brawner alleges that the untreated seizures left her with brain damage.  Perhaps not at all coincidentally, Brawner's mistreatment at the Scott County Jail overlapped the time-period in which Mr. Pemberton was mistreated and eventually died (July 2016).

-40-

144.     As in this case, Brawner filed a federal lawsuit against Scott County, some of the jailers and some medical professionals working inside the Jail.  There, as here, the jailers and medical professionals  did nothing about Brawner's serious medical condition.  They failed to provide her with required medication and even failed to provide her with any medication after she began having seizures, allowing her to seize, as they allowed Mr. Pemberton's infection to spread without any treatment whatsoever.  According to Brawner, the Jailers even accused her of "faking" the seizures.  As with Mr. Pemberton, Jailers essentially punished her for being so sick, taking her into another room and trying to taze her out of "faking it."[13]

145.     Second, Jesse Perry, another former inmate whose incarceration in the Scott County Jail also overlapped Mr. Pemberton's, alleges that he contracted tuberculosis during his time at the facility and claims that he and other inmates were exposed to the disease while incarcerated in the Jail.  *Perry v. Scott County, et al.*, No. 3:17-cv-00234-TAV-HBG, Doc. 1, at Page ID#: 1-10 (E.D. Tenn. June 1, 2017).  Perry alleges that the Jail's health-screening protocols jeopardized his health.  Perry alleges that corrections officers ignored serious medical conditions and the Sheriff allowed inmates to be booked at the jail without proper health-screening as a mere cost-saving measure.[14]

150.     This history constitutes a custom resulting from deliberate indifference of constitutional violations of the Individual Defendants and the John and Jane Doe Defendants.  But

---

[13]Although Plaintiff alleges that her son was punished for being sick by, among other things, being put in "the hole," Plaintiff makes no allegation – at this time – that Mr. Pemberton was tazed or otherwise assaulted.  Once Plaintiff and her attorney have been able to obtain the Jail Records and to engage in discovery, she may seek to amend her allegations against the Defendants or to add Defendants.

[14]Notably, Perry periodically shared a cell with Mr. Pemberton when Mr. Pemberton was not in "the hole."

-41-

for this unconstitutional custom, the Individual Defendants and the John and Jane Doe Defendants would not have exhibited deliberate indifference to Mr. Pemberton's serious need for adequate medical care throughout his incarceration from July 6, 2016 to July 20, 2016, but would have provided him the necessary antibiotics and immediately sent him to the hospital or otherwise afforded him adequate medical care once he began experiencing the tell-tale signs of a serious infection.

151.    Mr. Pemberton's death was proximately caused by Scott County's unconstitutional customs, policies and procedures.

152.    In this case, the policy and procedures of Scott County, as described herein, were substantial factors in causing Mr. Pemberton's death.

153.    For all of these reasons, Scott County has abdicated its governmental responsibilities to provide a safe and secure incarceration environment to suspects suffering severe mental disorders.

154.    Based on the foregoing, Plaintiff therefore sues Scott County for its customs, policies and procedures which caused the Individual Defendants and the John and Jane Doe Defendants to exhibit deliberate indifference to and violate Mr. Pemberton's right to be provided adequate medical care for a serious medical need.  Plaintiff seeks any and all damages allowable under state or federal law; attorney's fees pursuant to 42 U.S.C. § 1988; costs of this action; and discretionary costs.

## COUNT FIVE

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
### 42 U.S.C. §§ 1983 and 1988

### (MONELL CLAIM)
### Failure to Train and Supervise and
### Ratification of Unconstitutional Conduct
### (Against Scott County)

155. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

### *Defacto Policy, Practice, or Custom*

156. Scott County had a duty of care to Mr. Pemberton to ensure that its officers and agents were properly trained in the appropriate procedure for provision of adequate medical care. This duty extends to ensuring that officers and agents were properly trained concerning the limits of their authority to withhold medical care, particularly as to inmates presenting a serious medical need. The duty further extends to ensure that supervisory officers are properly trained not to overlook or condone unnecessary and unreasonable deprivations of adequate medical care by officers and agents. These duties were all breached, as described herein.

157. Scott County, through its policies and procedures, has failed to adequately train and supervise its employees, officers and agents (including medical personnel) to provide inmates adequate medical care for serious medical needs. For example, but for Scott County's improper policies and procedures, (a) Mr. Pemberton's medical condition would not have been permitted to go completely untreated and to worsen throughout his incarceration, resulting in a horribly painful and undignified death; (b) someone in the Jail would have provided him medical care instead of laughing at him and disregarding the severity of his condition because of his drug addiction; and ©

-43-

the truth of Mr. Pemberton's medical condition would have been explained to EMS responders and hospital medical personnel.

158. By ratifying the mistreatment of Mr. Pemberton by the Individual Defendants, including the John and Jane Doe Defendants, Sheriff Phillips and Chief Deputy Silcox acquiesced in the unconstitutional conduct of their subordinates through the execution of their job functions. These actions constitute ratification and render Scott County liable to Plaintiff.

159. Upon information and belief, Scott County has failed to develop a lawful policy of providing adequate medical care to inmates and failed to train its officers and agents in the proper manner in which to provide adequate medical care. No such policy exists, and if it does, it is so ineffectual to be no policy at all. Scott County's failure to develop and promulgate lawful policies outlining the guidelines for the appropriate provision of adequate medical care and to properly train officers and agents to follow such guidelines constitute deliberate indifference to the Constitutional rights of citizens.

160. The actions of the Individual Defendants, including the John and Jane Doe Defendants, evidences a complete lack of training in the proper methods related to providing adequate medical care to inmates requiring it. The failure of supervisors to recognize or appreciate the gravity of those officers' actions implies that they, too, found no wrong in the conduct, giving them and other officers the "green light" to continue to violate the civil rights of inmates in this manner.

161. Official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.

-44-

162.     The acts and omissions of the aforementioned officers and supervisors demonstrate that prior to July 6, 2016, Scott County had developed and maintained a defacto policy, custom, or practice exhibiting deliberate indifference to the deprivation of adequate medical care to inmates in serious medical need, which ultimately caused violations of Mr. Pemberton's civil rights.

163.     Here, the Individual Defendants, including the John and Jane Doe Defendants, rightly believed their actions would not be properly monitored or corrected by supervisory officers and that their misconduct would be tolerated and accepted.

164.     All of these failures demonstrate a policy, practice, or custom that resulted in Mr. Pemberton's death.  Scott County, while having established certain "policies and procedures" regarding the procedure for the provision of medical care, fail to enforce those policies and/or to appropriately discipline and/or sanction those who disregard those policies and procedures, establishing, by custom and usage, a de facto policy of, among other things, allowing the unnecessary and unreasonable deprivations of adequate medical care to go unchecked.

165.     Such acts and omissions on the part of all Defendants, including the Doe Defendants, constitute a violation of §1983 and were done to deprive Mr. Pemberton of his rights under the Eighth and Fourteenth Amendments.

166.     The actions of Defendants were done with actual malice and willful and wanton indifference toward Mr. Pemberton and with deliberate disregard for his Constitutional and statutory rights, constitute deliberate indifference, and were the direct and proximate cause of his death.

### Ratification of Unconstitutional Conduct

167.     Here, Detective Lewallen informed the Plaintiff that there would be no investigation of the circumstances surrounding her son's (Mr. Pemberton's) death.  He based his decision,

-45-

authorized by Sheriff Phillips and Chief Deputy Silcox, on his ridiculous and false claim that Mr. Pemberton's death was somehow the result of past drug use.

168.    In fact, at the moment he made that statement to the Plaintiff, Detective Lewallen had before him Dr. Mileusnic's autopsy report that showed that Mr. Pemberton's death had nothing whatsoever to do with drug use, but was caused by an infection that began in a cut on his left foot and spread rapidly through his body.  The report showed that none of the old needle marks or tracks on Mr. Pemberton's body contained any abscess or bacteria at all.

169.    Detective Lewallen stood by his unreasonable and unsupported basis for not investigating the circumstances under which Mr. Pemberton was allowed to go two weeks in Scott County's care in a seriously-ill, then critically-ill medical condition, without any medical treatment whatsoever.  Not one of the officers who knew of Mr. Pemberton's medical condition and were, at various points, in a position to render aid to Mr. Pemberton, were investigated by Scott County.  Not one of the officers who lied on their reports about Mr. Pemberton's condition on the evening preceding his death were investigated by Scott County.  Not one of the officers who was involved in failing to call 911 for Mr. Pemberton when he was initially found unconscious, first on July 18, 2016, then on July 20, 2016, was investigated by Scott County.  Not one of the officers who gave false and misleading information to medical professionals and/or withheld vital information from medical professionals about Mr. Pemberton's medical condition during his confinement was investigated by Scott County.  Not even Officer Brown, who ordered trusties to clean Mr. Pemberton up after he was found on the cell floor comatose and then made at least four telephone calls before she had someone call for an ambulance, was investigated by Scott County.

-46-

170.     By ratifying the behavior of the Individual Defendants, including the John and Jane Doe Defendants, Scott County, Sheriff Phillips, Chief Deputy Silcox, and Detective Lewallen knowingly acquiesced in and ratified the unconstitutional conduct of their subordinates through the execution of their job functions.  Their failure to take any action to remedy Detective Lewallen's refusal to investigate the circumstances surrounding Mr. Pemberton's death, to discipline officer misconduct, or take other corrective action was an implicit ratification of unconstitutional actions.

171.     Plaintiff is entitled to punitive and actual damages, pursuant to 42 U.S.C. §1988. Plaintiff is also entitled to an award of attorneys' fees, costs and expenses under 42 U.S.C. §1988.

## COUNT SIX

### VIOLATION OF FEDERAL CIVIL RIGHTS
### 42 U.S.C. §§ 1983 and 1988

### (MONELL CLAIM)
### Use of Cruel and Unusual Punishment
### (Against Scott County)

172.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

173.     At all times material hereto, Scott County and Sheriff Phillips authorized the use of "the hole" at the Scott County Jail.

174.     The use of "the hole," an isolation cell, to segregate Mr. Pemberton from others under the facts of this case constituted cruel and unusual punishment, which violated Mr. Pemberton's rights under the Eighth and Fourteenth Amendments.

175.     Scott County and the Scott County Sheriff' 's Office owed a duty of care to Mr. Pemberton to ensure that its agents were properly trained in the use of punishment, particularly as to seriously ill inmates; the limits of the authority to impose punishment on inmates, particularly as to seriously ill inmates; and that supervisory officers not condone the imposition of cruel and unusual

-47-

punishment, particularly as to seriously ill inmates. Specifically, Scott County and the Scott County Sheriff's Office owed a duty of care to properly train those officers and personnel working at the jail concerning the appropriate use of "the hole."

176.    The use of isolation cells frequently serves a legitimate penalogical purpose, but using such cells to punish seriously ill inmates or to do so merely to remove them from the general population because their illness causes them to be disruptive, without providing them any medical treatment whatsoever, is cruel and unusual punishment. Here, Mr. Pemberton was put in "the hole" on at least two separate occasions during his two-week long confinement for reasons not legitimate to the purpose of solitary confinement.

177.    On neither occasion was Mr. Pemberton provided medical treatment, adequate or otherwise. Instead, he was placed in "the hole" as a means to segregate him in an area where his cries for help would be less disruptive to officers and other inmates. Sheriff Phillips has known that "the hole" is used as punishment for seriously ill inmates or to keep them in a less disruptive location, yet, he failed to take action to prevent the abuses.

178.    Scott County and the Scott County Sheriff's Office's failure to develop and promulgate policies outlining the guidelines for appropriate use of "the hole" constitutes deliberate indifference to inmates' constitutional rights.

179.    Scott County and the Scott County Sheriff's Office have established, by custom and usage, a de facto policy of permitting "the hole" to be used as a punishment against seriously ill inmates, in violation of Mr. Pemberton's constitutional rights to be free from cruel and unusual punishment.

-48-

180.     Scott County and the Scott County Sheriff's Office had actual or constructive knowledge that "the hole" was being used in a manner that was coercive and in violation of the rights of inmates to be free from cruel and unusual punishment, yet acquiesced to the continued unconstitutional use.

181.     As a result, Mr. Pemberton suffered substantial physical and psychological injury and pain and suffering.  Accordingly, Plaintiff is entitled to punitive and actual damages, pursuant to 42 U.S.C. §1988.  Plaintiff is also entitled to an award of attorneys' fees, costs and expenses under 42 U.S.C. §1988.

## COUNT SEVEN

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW

## 42 U.S.C. §§ 1983 and 1988

### Against Advanced Correctional Healthcare

182.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

183.     For purposes of 42 U.S.C. § 1983, Advanced Correctional Healthcare ("ACH") acted under color of state law in providing medical care to pre-trial detainees such as Mr. Pemberton.

184.     Upon information and belief, ACH was the contracted medical provider for providing medical care to pre-trial detainees and inmates in the Scott County Jail at all times relevant hereto.

185.     Upon information and belief, Defendant Masssengale and John and Jane Doe Defendants 11-15 are employees of ACH.

186.     Mr. Pemberton's mistreatment was a result of a continued pattern of misconduct.  The Individual Defendants, including the Jane and John Doe Defendants, were repeatedly unresponsive

-49-

to his obvious medical needs, and repeatedly failed to secure for him necessary medical treatment. Such actions or inactions on the part of the Individual Defendants, including the Jane and John Doe Defendants, are the result of the policies, procedures, customs, and practices of Defendant Advanced Correctional Healthcare, Inc. and Unknown Defendants. These policies demonstrated a negligent, intentional and/or deliberate indifference to the health, well-being, and constitutional rights of Mr. Pemberton.

187.    Upon information and belief, ACH has a history of failing to provide adequate medical care to inmates and pretrial detainees.  These prior incidents constitute a custom which caused the deliberate indifference constitution violations of Nurse Massengale and John and Jane Doe Defendants 11-15.  But for this unconstitutional custom, Defendant Massengale and John and Jane Doe Defendants 11-15 would not have violated Mr. Pemberton's constitutional rights but would rather have afforded him adequate medical care for his serious medical need throughout his incarceration from July 6, 2016 to July 20, 2016, including providing him with the necessary antibiotics and immediate hospitalization or otherwise afforded him adequate medical care once he began experiencing the tell-tale signs of a serious  infection.

188.    Upon information and belief, ACH through its policies and procedures, has failed to adequately train and supervise its employees, officers and agents (medical personnel or otherwise) to provide detainees and inmates adequate medical care for serious medical needs.

189.    Such practices constitute an arbitrary use of government power, and demonstrate a total, intentional, deliberate, reckless, and unreasonable disregard and indifference to the value of

the lives and constitutional and common law rights of inmates at the Jail, including Mr. Pemberton, and the systematic and deliberate violations of those rights that are likely to result from the regular and systematic pursuit of such practices.

190. Mr. Pemberton's death was proximately caused by Scott County's unconstitutional customs, policies and procedures.

191. Plaintiff therefore sues ACH and seeks any and all damages allowable under state or federal law, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT EIGHT

## WRONGFUL DEATH

## TENN. CODE ANN. §§ 20-5-106 et seq.

192. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

193. Plaintiff brings this action as the Court-appointed Administratrix and personal representative of the Estate of Benny Shane Pemberton, as authorized by Tenn. Code Ann. §§ 20-5-106 et seq., the Tennessee wrongful death statute. Plaintiff is a citizens and resident of Scott County, Tennessee, and Mr. Pemberton was, before his death, a citizen and resident of Scott County, Tennessee.

194. Defendants owed a duty of due care to Mr. Pemberton at all times relevant to this action, and violated that duty in the manner alleged herein.

195. Defendants knew that Mr. Pemberton, an inmate in their custody and care, had a serious medical need, as evidenced by his numerous and worsening symptoms. Despite knowing that Mr. Pemberton was seriously ill and that his condition was rapidly getting worse, Defendants

-51-

ignored Mr. Pemberton's repeated complaints and symptoms, and the complaints of other inmates on his behalf, and failed to render any medical care whatsoever to Mr. Pemberton throughout his incarceration. Consequently, his infection was allowed to spread from his left foot to his left leg, and ultimately to his heart, brain, kidneys, liver, spleen, pancreas, and other organs, and by the time the Defendants sought medical aid for Mr. Pemberton, he was comatose, and never recovered. He died hours later, on July 20, 2016.

196.    The foregoing acts of the Defendants proximately caused fatal injuries to Mr. Pemberton, entitling Plaintiff to recover compensatory damages from Defendants for all such damages. Said damages include, but are not limited to, the pain and suffering Mr. Pemberton suffered before his death, Mr. Pemberton's lost wages, and medical, funeral, and/or related burial expenses.

197.    The above acts of negligence and negligence per se of the Defendants were performed knowingly, wantonly and with gross disregard for the safety and welfare of Mr. Pemberton. Said acts entitle Plaintiff to joint and several judgments for punitive damages from all Defendants.

198.    Based upon the foregoing allegations of this Complaint, Plaintiff is entitled to recover a judgment against the Defendants, jointly and severally, in the amount of Five-Million ($5,000,000) Dollars in compensatory damages, and Five Million ($5,000,000) Dollars in punitive damages.

## COUNT NINE

### OUTRAGEOUS CONDUCT/ INTENTIONAL
### INFLICTION OF EMOTIONAL DISTRESS
### (Against All Individual Defendants)

199.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference into this Count of the Complaint, as if set forth verbatim herein.

200.     The allegations outlined herein against the Individual Defendants, including the John and Jane Doe Defendants, while acting under color of law, were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

201.     The conduct of the Individual Defendants, including the John and Jane Doe Defendants, as alleged above, was outrageous.  They knew, or should have known, that their conduct would result in serious injuries and severe emotional distress to Mr. Pemberton, and their conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish, and severe emotional distress upon Mr. Pemberton.

202.     The wrongful acts of the Individual Defendants, including the John and Jane Doe Defendants, were willful, oppressive, intentional and malicious; therefore, punitive damages should be assessed against them in an amount deemed sufficient to punish and deter them and others in similar positions of authority from engaging in similar conduct in the future.  By reason thereof, Plaintiff claims punitive damages in an amount to be proven at trial.

## VII.   JURY DEMAND

203.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.     That Defendants be served with a copy of this Complaint and be required to answer;

B.     That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

-53-

C.     That Plaintiff, as Administratrix and personal representative of the Estate of Benny Shane Pemberton, be awarded such damages as will fully compensate the Estate for all injuries caused by Defendants' actions and that a judgment in favor of Plaintiff be entered;

D.     That Plaintiff, as Administratrix and personal representative of the Estate of Benny Shane Pemberton, be awarded compensatory damages in an amount to be determined by the trier of fact, not to exceed $5,000,000;

E.     That Plaintiff, as Administratrix and personal representative of the Estate of Benny Shane Pemberton, be awarded punitive damages against the Defendants in an amount to be determined by the trier of fact, not to exceed $5,000,000;

G.     That Plaintiff, as Administratrix and personal representative of the Estate of Benny Shane Pemberton, recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law;

H.     That Plaintiff, as Administratrix and personal representative of the Estate of Benny Shane Pemberton, be awarded pre-judgment and post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 20th day of July, 2017.


*/s/ Lance K. Baker*
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: 865-525-7028
Fax: 865-525-4679
lkbakerlaw@gmail.com

*Counsel for Plaintiff*

-54-